******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TINA FLOWERS
(AC 37235)

Gruendel, Lavine and Keller, Js.*

*Submitted on briefs October 9—officially released December 15, 2015*

(Appeal from Superior Court, judicial district of Fairfield, geographical area number two, Blawie, J.)

*Cameron R. Dorman*, assigned counsel, filed a brief for the appellant (defendant).

*John C. Smriga*, state's attorney, *Matthew R. Kalthoff*, special deputy assistant state's attorney, and *Nicholas J. Bove, Jr.*, senior assistant state's attorney, filed a brief for the appellee (state).

*Opinion*

KELLER, J. The defendant, Tina Flowers, appeals from the judgment of conviction, rendered following a jury trial, of larceny in the fifth degree in violation of General Statutes §§ 53a-119 and 53a-125a (a). Also, the jury found the defendant to be a persistent larceny offender under General Statutes § 53a-40 (e).[1] The defendant claims that (1) the evidence did not support the jury's verdict and (2) prosecutorial impropriety during closing argument deprived her of a fair trial. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. Shortly before 5 p.m., on January 3, 2013, the defendant, while in a Walmart store on Barnum Avenue in Stratford, placed a fifty inch television into a shopping cart. Thereafter, the defendant placed a computer into a second shopping cart. These items, valued together at $946, were contained within large boxes to which security devices were attached. While pushing one shopping cart and pulling the other shopping cart, the defendant began to make her way from the electronics department to the front of the store.

Nicholas Vargas, an undercover asset protection associate employed by Walmart, was monitoring activities in the electronics department, an area of the store known to him to be frequented by shoplifters, when he observed the defendant place the items in the shopping carts. After he had observed the defendant look up at the store's security cameras, Vargas suspected that she potentially was a shoplifter. At this juncture, he requested that one or more other asset protection associates of the store monitor the defendant by means of the store's security cameras.

The defendant, who periodically looked from side to side as she walked within the store with the items in the shopping carts, bypassed the cashiers at the front of the store, and did not attempt to pay for the items. The defendant stopped for a short time in the vicinity of a customer service counter near the store's exit, at which time she appeared to look at her cell phone and to check her surroundings. Then, the defendant, pushing the shopping cart with the computer in it ahead of her, walked through the sliding exit doors and into the enclosed vestibule that led to the parking lot. She continued to pull the shopping cart with the television in it behind her while exiting the store via the vestibule.

At this point, Vargas approached the defendant, identified himself as an asset protection associate, and asked the defendant if she had paid for the items in the carts. The defendant replied that she had not. The defendant stated "that she was just going to bring the merchandise outside to someone waiting in the car to see if . . . these were the items that they wanted."

Vargas informed the defendant that her conduct constituted theft, stated that she was not free to leave the store, and asked her to accompany him to the store's asset protection office, which was nearby. At this point, the defendant became upset and began to engage in "[a] lot of screaming and yelling" to convey her displeasure at having been stopped by Vargas.

In response to the defendant's disruptive conduct in the presence of other customers, Vargas called the police to report the incident. Soon thereafter, police officers arrived on the scene. Officer Todd Moore of the Stratford Police Department found the defendant engaged in a loud argument with Vargas when he arrived. Moore led Vargas and the defendant into the store's asset protection office. Vargas provided Moore with a written statement. The defendant explained to Moore that "she was trying to return some items, and she was waiting for a friend or a cousin that was outside and they were going to return the items." No third party claiming to be associated with, let alone waiting for, the defendant presented himself or herself to the police or to Vargas. Moore remained in the store for fifteen to twenty minutes, and ultimately placed the defendant under arrest. At Moore's request, other officers removed the defendant from the store because her belligerent and uncooperative conduct was disruptive to his investigation.

Following a jury trial, the defendant was convicted of larceny in the fifth degree and of being a persistent larceny offender. This appeal followed. Additional facts will be set forth as necessary.

I

First, the defendant claims that the evidence did not support the jury's verdict.[2] We disagree.

Section 53a-125a (a) provides: "A person is guilty of larceny in the fifth degree when he commits larceny as defined in section 53a-119 and the value of the property or service exceeds five hundred dollars." Section 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

"Connecticut courts have interpreted the essential elements of larceny as (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner. . . . Because larceny is a specific intent crime, the state must show that the defendant acted with the subjective desire or knowledge that his actions constituted stealing. . . . Larceny involves both taking and retaining. The criminal intent involved in larceny relates to both aspects. The taking

must be wrongful, that is, without color of right or excuse for the act . . . and without the knowing consent of the owner. . . . The requisite intent for retention is permanency." (Citation omitted; internal quotation marks omitted.) *State* v. *Torres*, 111 Conn. App. 575, 584–85, 960 A.2d 573 (2008), cert. denied, 290 Conn. 907, 964 A.2d 543 (2009). "Because taking is not defined in the Penal Code, we consider the ordinary usage of that term. . . . A criminal taking is [t]he act of seizing an article, with or without removing it, but with an implicit transfer of possession or control. Black's Law Dictionary (7th Ed. 1999). . . . Further defining a taking . . . Webster's Third New International Dictionary . . . defines take as 1: to get into one's hands or into one's possession, power, or control by force . . . as . . . to seize or capture physically . . . 6: to transfer into one's own keeping . . . enter into . . . use of . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Henry*, 90 Conn. App. 714, 726, 881 A.2d 442, cert. denied, 276 Conn. 914, 888 A.2d 86 (2005).

Having set forth the essential elements of the crime, we now set forth our well settled standard of review. "The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or

facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 16–17, 115 A.3d 447 (2015).

A

First, the defendant argues that the state failed to present sufficient evidence that she possessed the requisite intent for the commission of the crime. The defendant argues that "intent to commit larceny could not be reasonably inferred from [her] conduct. [She] did not engage in any kind of furtive actions in an attempt to conceal the goods or disable the security devices on the goods. Neither did she act in a suspicious or nervous manner." She argues that the surveillance video from the store that was presented in evidence belies Vargas' testimony that she had acted in a suspicious manner, but that it depicted "the actions of a typical customer under the same circumstances." Additionally, she argues that it was unreasonable to infer that her conduct in entering the vestibule demonstrated a larcenous intent because such area is "not outside of the store building," the store did not post a policy that the area was considered outside of the store, and no security alarms were triggered by her conduct. Further, she argues that the fact that she "willingly" reentered the store and provided a benign explanation for her conduct demonstrated that she lacked such a criminal intent. Additionally, the defendant challenges Vargas' credibility, suggesting that he ignored aspects of her explanation. Finally, she also challenges the adequacy of Moore's investigation into her version of the relevant events.

"It is axiomatic that a jury may infer intent from behavior. As our Supreme Court has stated, direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Raynor*, 84 Conn. App. 749, 760, 854 A.2d 1133, cert. denied, 271 Conn. 935, 861 A.2d 511 (2004).

In the present case, Vargas unambiguously testified that, in an area of the store in which "high ticket items

. . . are constantly being stolen," he observed the defendant engage in behavior that led him to suspect that she might be a shoplifter. He elaborated that, after the defendant placed the television and the computer into carts, "she began to look around at cameras in the ceiling, which is an indicator that someone's going to walk out." The surveillance video presented in evidence depicted the defendant's conduct in the electronics department of the store, while she walked throughout the store, and at the exit of the store. This evidence demonstrated that she placed expensive items in her shopping carts, walked with the carts to the front of the store while looking from side to side, bypassed the cashiers, stopped briefly near the exit where she looked at her cell phone and checked her surroundings, and pushed the cart carrying the computer through the doors and into the vestibule while pulling the cart carrying the television behind her. On the basis of this evidence of the defendant's conduct *during the criminal act* and the rational inferences to be drawn therefrom, a jury reasonably could infer that the defendant possessed larcenous intent in that she intended to deprive Walmart of the items in her carts permanently.

The evidence of the defendant's conduct after her criminal actions provided further support for a finding that she acted with a larcenous intent. Even if the defendant had willingly accompanied Vargas after she had been stopped, such conduct would not preclude a finding of guilt. Moreover, ample evidence demonstrated that the defendant did not willingly accompany Vargas. Vargas testified that, when he stopped and detained the defendant, she became disruptive, which led him to call the police. Moore testified that the defendant was so disruptive during his investigation that he had to enlist the assistance of one or more other police officers to remove her from the store. It would not be unreasonable for the jury to infer that the defendant's disruptive and uncooperative conduct reflected her consciousness of guilt and, by its nature, belied her benign explanations for the events at issue. Furthermore, the fact that the explanations that the defendant provided to Vargas and Moore were contradictory is significant in an analysis of her intent. Because it is reasonable to infer that contradictory explanations suggest evasiveness or untruthfulness, this was evidence from which the jury could infer that the defendant's explanations were an attempt to conceal the criminal nature of her actions.

A brief examination of the substance of these explanations provides yet additional support for a finding of larcenous intent. The evidence demonstrated that the defendant stated to Vargas "that she was going to just bring the merchandise outside to someone waiting in the car to see if . . . these were the items that they wanted." The evidence demonstrated that, in contrast with the statement she made to Vargas, the defendant stated to Moore that "she was trying to return some

items, and she was waiting for a friend or a cousin that was outside and they were going to return the items." "The jury is entitled to draw reasonable inferences from the evidence before it and, in performing its function, the jury brings to bear its common sense and experience of the affairs of life." (Internal quotation marks omitted.) *State* v. *Ramirez*, 94 Conn. App. 812, 822, 894 A.2d 1032, cert. denied, 278 Conn. 915, 899 A.2d 621 (2006). "It is often said that common sense is not left at the courthouse door." (Internal quotation marks omitted.) *Lederle* v. *Spivey*, 113 Conn. App. 177, 194, 965 A.2d 621, cert. denied, 291 Conn. 916, 970 A.2d 728 (2009). Setting aside the testimony from Moore that no third party associated with the defendant had approached the police during the course of his immediately ensuing investigation at the store, which undermined the credibility of the defendant's explanations, it would have been entirely reasonable for the jury to find that neither of these explanations was credible because people typically do not bring unpaid for, expensive electronics items outside the store in which they are offered for sale so that such persons can determine whether to purchase them or because they are waiting for third parties. The jury reasonably rejected the defendant's arguments that she behaved like a typical customer.

To the extent that the defendant suggests that the surveillance video conflicted with Vargas' testimony that she was acting suspiciously by looking for surveillance cameras in the store, we observe that the surveillance video, which was not of such a resolution that it clearly depicted the movement of the victim's eyes, did not plainly contradict Vargas' testimony. Under these circumstances, the jury was free to resolve this factual issue in favor of Vargas' testimony, which indicated that she had glanced at security cameras and had behaved in a suspicious or nervous manner. "It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony." (Internal quotation marks omitted.) *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014). Moreover, it is of no consequence to our analysis that the defendant did not attempt to conceal the items in the carts or disable the security devices attached to them. The jury reasonably could have inferred that the defendant did not attempt to conceal a fifty inch television and a computer because it would have been difficult, if not impossible, to do so. The jury reasonably could have believed that the defendant did not disable the security devices because doing so would have drawn the attention of store employees. And, in light of the defendant's other conduct, the jury reasonably could have inferred that the defendant's plan was to act in a manner that did not draw attention to herself, such as by running through the store or by creating any type of a distraction. The jury could have inferred that the defendant

believed that she would be successful by leaving the store with the items by keeping them in the carts, in plain sight, and simply walking out of the store. Additionally, in light of all of the evidence presented, the fact that the defendant did not appear to remove or disable the security devices on the items did not preclude the jury's finding of guilt. The jury reasonably could have inferred that the defendant was unaware of either the presence or purpose of the devices, or that the defendant believed she could accomplish her larceny despite them.

The defendant suggests that her entering the vestibule was not tantamount to her exiting the store, and that there was no evidence that she had been made aware of a store policy that considered this area to be outside of the store. Yet, to resolve the factual issues before it, the jury need not have determined with precision where the inside of the store ended and where the outside of the store began. Nor was the jury invited to determine any of the issues before it consistent with store policies. The state did not bear the burden of demonstrating that the defendant successfully had taken the items in her possession and control outside of the store, that alarms had been sounded, or that the defendant had been alerted to store policies. To demonstrate that larceny has occurred, "[n]either the statutes nor the case law requires that the property [at issue] actually be removed from the owner's premises . . . ." *State* v. *Jennings*, 125 Conn. App. 801, 811–12, 9 A.3d 446 (2011). Vargas testified that the store's policy was not to stop suspected shoplifters "until they pass all points of sale," and that the vestibule was considered to be such an area. The jury heard testimony about where the defendant was stopped and observed a surveillance video that depicted the defendant's conduct in the store. This evidence was consistent with Vargas' testimony. On the basis of this evidence, perhaps informed by evidence of store policy, the jury reasonably could find that the area in which the defendant was stopped supported a finding that she had acted with a larcenous intent.

To the extent that the defendant attempts to cast doubt on Vargas' credibility generally, by suggesting that there were inaccuracies or inconsistencies in his testimony or that the evidence suggested that he was inattentive to her explanation of what had occurred, we reiterate that it was the province of the jury, and not this court, to evaluate Vargas' testimony.

Finally, the defendant argues that, with a more complete investigation, Moore would have been able to substantiate her version of events by learning that third parties, including her cousin, Peter Taylor, and her cousin's fiancée, Starr White, were waiting for the defendant outside of the store, as the defendant had indicated to Moore. We observe that the defendant,

during her case-in-chief, presented the testimony of Taylor and White.[3] The jury was free to accept or reject their testimony, in whole or in part, in considering the issues before it. On the basis of the jury's finding of guilt, we must presume that the jury did not find that the testimony of these defense witnesses justified a verdict of not guilty. Any claim that Moore's investigation was deficient does not undermine the sufficient evidence of the defendant's guilt.

## B

Second, the defendant argues that the state failed to present sufficient evidence to support a finding that a wrongful taking had occurred. She argues in relevant part: "The evidence shows that the defendant selected two items, put them in two shopping carts, and walked through the store to the customer service area. While this evidence shows the goods were in the defendant's possession, it is a permissible possession granted to all shoppers in the store and does not reflect an implicit transfer of power and control [of the goods] to the defendant." She argues that "there was no evidence of any forceful actions to take control of the goods." Also, she argues that "no evidence was presented that reflected some scheme or strategy to seize control of the goods."

Considering the evidence in light of the prior judicial interpretation of "taking" set forth previously in our discussion of this claim, we readily conclude that the evidence and reasonable inferences to be drawn from the evidence permitted the jury to find that the defendant had engaged in a wrongful taking of the items in the shopping carts. The defendant, in her arguments on appeal, implicitly acknowledged that she possessed and controlled the items in the carts after she had put them in the carts. Viewed in the light most favorable to sustaining the jury's finding of guilt, the evidence did not demonstrate that the defendant merely had exercised the type of noncriminal possession and control of unpaid for merchandise that typically is exercised by shoppers who carry items in their hands or in shopping carts *before the point of sale*. Here, the defendant—not a third party—continued to exercise exclusive possession and control of the unpaid for merchandise *past the point of sale* when she pushed the carts into the vestibule at the exit. Such conduct occurring past the point of sale, in light of all of the other evidence and inferences logically drawn therefrom, amply demonstrated the requisite level of possession and control to support a finding that a taking had occurred. In light of all of the evidence of the defendant's conduct in the store, the jury reasonably could have found that the defendant's conduct past the point of sale transformed conduct that was noncriminal in other areas of the store into a wrongful taking.

The defendant argues that the evidence was insuffi-

cient because "there was no evidence of any forceful actions to take control of the goods." It does not appear from our review of relevant legal authority that the degree of force required for the commission of the crime is anything more than that degree of force necessary to transfer possession and control of the property at issue. See *State* v. *Henry*, supra, 90 Conn. App. 726. The defendant does not argue that the law is otherwise. Here, the evidence readily supports a finding that she lifted a television and a computer, both of which were of a substantial size, and placed them into shopping carts. She pushed and pulled these carts throughout the store, ultimately pushing and pulling them into the vestibule. The defendant has not demonstrated to this court that the degree of force exercised by her was inconsistent with a finding of guilt; the evidence demonstrated that she acted with sufficient force to control, possess and retain the items at issue.

To the extent that the defendant suggests that the evidence did not reflect a scheme or strategy to seize control of the items in the carts, we disagree. The defendant's lengthy pattern of loading expensive electronics items in two carts, checking for the presence of security cameras, walking to the front of the store while checking her surroundings, stopping near the customer service desk, looking at her cell phone and her surroundings near the customer service desk, and then pushing and pulling the carts into the vestibule undoubtedly suggested a scheme or strategy to take the items wrongfully. As we discussed in part I A of this opinion, the jury reasonably could have found that the defendant's scheme, though unsuccessful, was to act in a manner that did not draw attention to her.

In light of the foregoing, we conclude that the evidence demonstrated beyond a reasonable doubt that the defendant committed larceny in the fifth degree.

II

Next, the defendant claims that prosecutorial impropriety during closing argument deprived her of a fair trial. We disagree.

The facts on which the defendant bases her claim may be summarized as follows. On five occasions during the prosecutor's argument, the prosecutor suggested that there was evidence that the defendant had stated *to Moore* that she was taking the items in the carts outside of the store. Three of these instances occurred during the state's initial argument,[4] and two of these instances occurred during the state's rebuttal argument.[5] These five statements underlie the first part of the defendant's claim of prosecutorial impropriety. Additionally, on one occasion during the state's rebuttal argument,[6] the prosecutor stated that, in speaking with Vargas or Moore, the defendant had not referred to White, the fiancée of her cousin, Taylor.[7] This statement underlies the second

part of the defendant's claim of prosecutorial impropriety. At trial, the defendant did not object to any of the alleged instances of impropriety. The defendant argues that these comments were improper in that they mischaracterized the evidence and deprived her of a fair trial.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . . An appellate court's determination of whether any improper conduct by the prosecutor violated the defendant's right to a fair trial is predicated on the factors established in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Those factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . .

"As [our Supreme Court] previously [has] recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the

trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . .

"Claims involving prosecutorial impropriety during the course of closing argument require a court to evaluate a prosecutor's statements not for their possible meaning, but for the manner in which the jury reasonably and likely would have understood them. Because the meaning of words and statements typically is dependent on the context in which they are used, a court must carefully consider a prosecutor's challenged statements by carefully considering their context in the entire trial, including the remainder of the state's closing argument." (Internal quotation marks omitted.) *State* v. *LaVoie*, 158 Conn. App. 256, 274–76, 118 A.3d 708, cert. denied, 319 Conn. 929,      A.3d      (2015).

With regard to the first part of the defendant's claim of prosecutorial impropriety, our review of the record reflects that there was no evidence that the defendant had stated or suggested to *Moore* that she was taking the items in the carts outside of the store to show them to a third party in the parking lot, or that she had made comments of a substantially similar nature to Moore. Previously in this opinion, we discussed the two conflicting explanations that the defendant provided after she had been detained by Vargas. The evidence demonstrated that the defendant stated to *Vargas* "that she was going to just bring the merchandise outside to someone waiting in the car to see if . . . these were the items that they wanted." The evidence demonstrated that the defendant stated to Moore that "she was trying to return some items, and she was waiting for a friend or a cousin that was outside and they were going to return the items." Thus, the record reflects, and the state acknowledges before this court, that the prosecutor mischaracterized the evidence in this regard.

With regard to the second part of the defendant's claim of prosecutorial impropriety, the defendant argues that the prosecutor mischaracterized the evidence when he stated that, in explaining her conduct to Vargas and to Moore, the defendant had failed to refer to White. The defendant argues that the evidence demonstrated that she told Moore that she was waiting for her cousin, and that the surveillance video demon-

strates that she was looking for someone while inside of the store. Our review of the evidence reflects that the prosecutor's characterization of the evidence in this manner was reasonable and, thus, fair argument. The evidence reflects that Taylor is the defendant's cousin and that, at times relevant, White was his fiancée. Moreover, the evidence reflects that in explaining her actions to Vargas, the defendant referred to "someone waiting in the car," and that in explaining her actions to Moore, the defendant referred to "a friend or a cousin . . . ." There was no evidence that the defendant had referred to any third party, including White, by name. Although the evidence demonstrated that the defendant had referred to one or more third parties who were waiting for her outside of the store, it was fair comment on the evidence to state that she had not referred specifically to White.

Having determined that a mischaracterization of the evidence occurred with regard to the defendant's first claim of impropriety, we now turn to an evaluation of whether, under the *Williams* factors, this event rose to the level of an impropriety that deprived the defendant of a fair trial. With regard to the frequency of the conduct, the prosecutor made the statement a total of five times. Yet, although numerous during a closing argument that was not lengthy, all of these instances occurred during closing argument and, thus, any impropriety was not a pervasive characteristic of the entire trial. As the state acknowledged before this court, the record does not reflect that the prosecutor's statements were invited by defense conduct or argument. Additionally, as the defense did not object to the arguments, the court did not take any curative measures.

Turning to the centrality of the conduct at issue to the critical issues in the case, we readily conclude that any impropriety did not relate to a central issue before the jury. The central issues before the jury concerned the defendant's conduct prior to any statements that she made to Vargas or to Moore, and whether she had acted with a larcenous intent. Although the defendant's statements to Vargas and Moore amounted to strong circumstantial evidence related to the issue of her intent, it was not significant to any critical issue during the trial as to whether she had directed the comment at issue to Vargas or to Moore.

For similar reasons, we likewise conclude that any impropriety was not severe. It is undisputed that the substance of the prosecutor's comments finds complete support in the evidence,[8] and the record strongly suggests that the prosecutor merely misattributed to Moore what the defendant had said to Vargas. In situations involving a single impropriety of this nature, courts have not been inclined even to view the matter as involving prosecutorial impropriety. See, e.g., *State* v. *Roberts*, 158 Conn. App. 144, 152, 118 A.3d 631 (2015) ("[n]ot

every mistake by a prosecutor in closing argument, not every misstep, amounts to an impropriety"); see also *State* v. *O'Brien-Veader*, 318 Conn. 514, 534, 122 A.3d 555 (2015) ("[n]ot every misstep by a prosecutor that exceeds the bounds of a trial court order rises to the level of prosecutorial impropriety that implicates a defendant's due process rights, thus requiring resort to the second step in the prosecutorial impropriety analysis").

Although the defendant argues that the five misstatements at issue in the present case were evidence of an intentional ploy by the prosecutor to bolster Vargas' credibility, such an argument lacks any support in the record. The statements at issue were made in the context of arguments related to an assessment of the defendant's conduct and the manner in which she had attempted to explain that conduct. The statements were not made in the context of arguments related to Vargas' credibility which, in light of the video surveillance evidence of the conduct underlying the conviction, was not a central issue in the trial. Moreover, it is difficult to see what difference it would have made in the eyes of the jury for the state to have emphasized that the defendant had made the statement at issue to Moore instead of to Vargas. The critical evidence, damaging to the defense, remained that there was unambiguous testimony that, after the defendant was detained, she stated that she was attempting to take the items in her cart outside of the store. And, as we have discussed previously in this opinion, the fact that the defendant provided contradictory explanations for her conduct was circumstantial evidence that she was being untruthful to Vargas and to Moore.

Finally, we observe that the state's case was strong. The state presented persuasive testimonial and video surveillance evidence concerning the defendant's conduct. Although, as is customary, the issue of the defendant's intent rested on an evaluation of circumstantial evidence, the evidence in the present case strongly demonstrated that the defendant did not behave like a reasonable shopper, but like a person engaged in criminal conduct. In light of the foregoing, we conclude that any impropriety did not implicate the fairness of the trial.

The judgment is affirmed.

In this opinion the other judges concurred.

* Judge Lavine has replaced Justice Borden in this case. Judge Lavine has reviewed the record and briefs prior to participating in the resolution of this appeal.

[1] The defendant, assisted by standby counsel, exercised her right to self-representation during the proceedings at trial. The defendant was represented by counsel in the present appeal. The trial court sentenced the defendant to three years of incarceration, followed by two years of special parole. At the close of the state's case-in-chief, the court granted the defendant's motion for a judgment of acquittal with regard to one count of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (1).

[2] At the close of the state's case-in-chief, the defendant's standby counsel

raised a motion for a judgment of acquittal. The trial court denied the motion with regard to the charge of larceny in the fifth degree. Thereafter, the defendant presented evidence in her defense. "[W]hen a motion for [a judgment of] acquittal at the close of the state's case is denied, a defendant may not secure appellate review of the trial court's ruling without [forgoing] the right to put on evidence in his or her own behalf. The defendant's sole remedy is to remain silent and, if convicted, to seek reversal of the conviction because of insufficiency of the state's evidence. If the defendant elects to introduce evidence, the appellate review encompasses the evidence in toto." *State* v. *Rutan*, 194 Conn. 438, 440, 479 A.2d 1209 (1984).

[3] See footnote 7 of this opinion.

[4] The relevant portions of the prosecutor's argument are as follows. First, the prosecutor stated: "And you heard the police officer testify that she offered an explanation that she was taking the items outside the store to show somebody the items in the parking lot." Second, the prosecutor stated: "It doesn't make sense, the explanation she gave to the police officer, that she had a friend outside who wanted to inspect the merchandise to see if she wanted it." Third, the prosecutor stated: "And the only analysis, the only thing we've heard from the statement that [the defendant] gave to the police officer and the security officer is, basically, she was taking the items out of the store for someone to inspect in the parking lot."

[5] The relevant portions of the prosecutor's argument are as follows. First, the prosecutor stated: "It's interesting that when she was trying to explain herself to the police officer and to security, she didn't say anything about Starr [White], about looking around for Starr [White]; she kept talking about how she was going to bring the items out into the parking lot for somebody to check." Second, the prosecutor stated: "And as jurors and as citizens of this state, one has to use one's common sense in deciding just how logical were the defenses that were put forward by the defendant in this case through the police officer and the security officer. She didn't say, by the way, I was going to pay for them later. She simply said, I was bringing them outside to the parking lot so somebody could look at them."

[6] The prosecutor stated: "It's interesting that when she was trying to explain herself to the police officer and to security, she didn't say anything about Starr [White], about looking around for Starr [White]; she kept talking about how she was going to bring the items out into the parking lot for somebody to check."

[7] White and Taylor testified during the defendant's case. Essentially, both of these witnesses testified that they were at Walmart with the defendant on January 3, 2013. In relevant part, Taylor testified that, after he, the defendant and White went into the store, he became separated from the others and decided to wait in an automobile in the parking lot with his son. He testified that, later, he observed the defendant in the back of a police cruiser. White testified that she "dropped [the defendant] off" at the store to do some shopping and that she intended to bring an item belonging to the defendant into the store, which the defendant wanted to return at the customer service counter. White testified that she left the item in her automobile. After spending some time inside of the store, White went outside to retrieve the item. At this time, she observed the defendant sitting in the back of a police cruiser. White testified that she attempted to speak with the defendant, but the police told her to get away. Neither witness testified that he or she had the opportunity to observe the events underlying the defendant's detention and subsequent arrest.

[8] In her appellate brief, the defendant acknowledged that she "did tell [Vargas] that she was taking the items outside to show someone the items . . . ." For this reason alone, it is difficult to comprehend what prejudice, if any, the prosecutor's argument could have caused the defendant.